IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Deborah B. Morris, ) | |
| ) | Civil Action No. 6:10-1786 |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on January 23, 2007, alleging that she became unable to work on January 21, 2005. The application was denied initially and on reconsideration by the Social Security Administration. On July 3, 2007, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and a vocational expert appeared on June 11, 2009, considered the case *de novo*, and on August 19, 2009, found that the plaintiff was not under a disability

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on May 21, 2010.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.
>
> 2.  The claimant has not engaged in substantial gainful activity since January 31, 2005, the alleged onset date. (20 C.F.R. § 404.1571, *et seq.*)
>
> 3.  The claimant has the following severe impairment:  cervical disc disease (20 C.F.R. § 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) with some restrictions.  The claimant can do work involving lifting no more than 20 pounds at a time with frequent lifting up to 10 pounds, along with a good deal of walking or standing or pushing or pulling of arm and leg controls.  The claimant is restricted from repetitive overhead reaching with right or left arm.  The claimant can do constant handling and fingering.
>
> 6.  The claimant is unable to perform any past relevant work. (20 C.F.R. §§ 404.1565).

2

7. The claimant was born April 19, 1962, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 21, 2005 through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

3

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

4

(4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff alleges an onset of disability on January 21, 2005, at which time she was 42 years old. She has a twelfth grade education and past relevant work as a sewing machine operator.

The plaintiff was treated for carpel tunnel syndrome by S. John Millon, M.D. of The Hand Surgery Center. She had left carpal tunnel release surgery on February 22, 2005 (Tr. 170). On March 3, 2005, Dr. Millon performed a post-surgical evaluation. He indicated that the plaintiff could return to work one-handed duty if that was available (Tr. 215). On March 23, 2005, Dr. Millon stated that the plaintiff was quite pleased with her relief of numbness and pain in her left hand (Tr. 213). Dr. Millon indicated that the plaintiff was

5

to limit repetitive gripping with her left hand and limit lifting to no more than five pounds (Tr. 295).

On June 13, 2005, the plaintiff presented to the Greenville Memorial Hospital emergency room on June 9, 2005, for left neck and shoulder pain, which she rated as 10 out of 10. She also reported joint and back pain. The diagnosis was acute exacerbation of chronic left shoulder and back pain. She was advised to continue her current medications, apply warm compresses for 15 minutes every two hours, and see her private physician in one week (Tr. 217-26).

On June 13, 2005, the plaintiff was reevaluated by Doctors Care Berea. She was given a prescription for Lortab and a cervical MRI was suggested (Tr. 181-84). On July 8, 2005, the plaintiff complained of continued pain and was not released to any work. She was given prescriptions for Lortab and Flexeril, and Christopher Rubel, M.D. wrote a note that the plaintiff had been out of work since January 25, 2005, for left shoulder/arm pain (Tr. 176-79).

On March 20, 2006, Dr. Millon stated the plaintiff had excellent relief from the release surgery and had no specific restrictions (Tr. 214). On April 10, 2006, Dr. Millon completed an impairment rating for the plaintiff's left hand. He stated that she had a 4% permanent impairment under the AMA 5th Edition Guide to the Evaluation of Permanent Impairment (Tr. 212).

The plaintiff had right carpal tunnel release surgery on May 24, 2006 (Tr. 208). On July 28, 2006, Dr. Millon stated that the plaintiff could return to work with without any specific restrictions and that she needed to return to his office in six weeks (Tr. 209).

On August 15, 2006, the plaintiff presented to the Greenville Memorial Hospital emergency room for shoulder and neck pain. It was noted that she had chronic left shoulder pain and neck pain and had just started having right shoulder pain. She was given Toradol and Norflex. The plaintiff's final diagnosis was acute neck pain and possible

6

cervical disc disease.  She was given prescriptions for Dolobid, Skelaxin, and Lortab (Tr. 227-36).

The plaintiff had a cervical magnetic resonance imaging ("MRI") on August 31, 2006.  The tests revealed:  1)  shallow non-stenotic disc bulging at C2-3; 2)  shallow disc bulging into the right neural exit foramen at C3-4 narrows the right neural foramen; 3)  focal left paracentral disc herniation at C4-5; and, 4) disc degeneration with osteophytosis and diffuse disc bulging at C5-6 and C6-7 narrowing both neural exit foramina (Tr. 237).

Christopher Van Pelt, M.D. examined the plaintiff in September 2006.  He observed that the plaintiff generally had full range of motion, intact sensation, and normal strength and reflexes.  However, she did experience a degree of pain, and Dr. Van Pelt opined that removing a portion of a disc in the plaintiff's cervical spine (a cervical discectomy) would be the proper course of treatment.  He discussed with the plaintiff the details of the surgery and the risks involved (Tr. 241-43).

The plaintiff saw Charles Kanos, M.D. in December 2006 for a second opinion. Dr. Kanos performed his own examination, finding some evidence of pain, but full range of motion, normal strength, and normal muscle tone.  There was no evidence that the plaintiff experienced numbness from nerve impingement.  Dr. Kanos' assessment was cervical stenosis, cervical pain, and limb pain.  Dr. Kanos concurred with Dr. Van Pelt's opinion that a cervical discectomy would be the proper treatment.  Dr. Kanos did acknowledge that other conservative treatment was available, including injection, but "given the duration of her symptoms surgery should be considered."  Dr. Kanos also discussed the risks and benefits of surgery with the plaintiff (Tr. 245-47).  Dr. Kanos saw the plaintiff again on November 2, 2007, for a followup and to again discuss surgery.  Dr. Kanos noted that the plaintiff's symptoms were worse, and he again recommended a cervical discectomy (Tr. 382-83).  The plaintiff did not have the surgery.

In June 2009, Dr. Van Pelt and Dr. Kanos provided opinions at the request of the plaintiff's attorney.  The doctors wrote "Yes" in response to written questions, indicating that the plaintiff would have to rest during a workday; would miss more than three days of work per month; and would experience problems with attention and concentration (Tr. 388-89).

In February 2007, Dale Van Slooten, M.D., a State agency physician, reviewed the evidence found that the plaintiff was capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday.  He also found that the plaintiff could occasionally climb ladder/rope/scaffolds, and frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl.  He explained that a MRI scan of the plaintiff's neck did not show definitive evidence of nerve impingement.  The evidence also showed normal strength and tone, normal gate and station, intact sensation, and full range of motion.  There was consideration for pain.  Lastly, Dr. Van Slooten found the plaintiff's allegations regarding her symptoms "credible as reflected in the RFC."  Dr. Van Slooten limited the plaintiff to a range of medium work because of her pain (Tr. 263).

On March 26, 2007, Dr. Millon stated that he felt the plaintiff had reached maximum medical improvement for her right carpel tunnel (Tr. 311).  The comprehensive evaluation, testing, and discharge from The Hand Surgery Center was performed on this same date, and the only noted limitation of her right hand was in the category of "strength" (Tr. 270-77).

On April 9, 2007, Christopher Rubel of Doctor's Care Berea evaluated the plaintiff for continued problems and wrote prescriptions for Flexeril, Ultram, and Adepex (Tr. 302-303).

In May 2007, Hugh Clarke, M.D., another State agency physician, reviewed the evidence and concurred with Dr. Van Slooten's opinion.  Dr. Clarke noted, among other

8

evidence, that an operation was effective in relieving the plaintiff's carpal tunnel syndrome and that she was released by her physician, Dr. Millon, without restrictions (Tr. 314).

The plaintiff testified at the June 11, 2009, hearing before the ALJ (Tr. 15). She described pain radiating down her left arm and shoulder from her neck that prevented her from using a vacuum, washing clothes, or mopping (Tr. 18-19). The plaintiff stated that this pain made it difficult for her to sleep or to concentrate during the day. However, she admitted that she was not taking narcotic pain medications and was only directed to take ibuprofen by her doctors. She did receive a muscle relaxant (Flexeril) and an anti-inflammatory medication (Naproxen) (Tr. 21).

## ANALYSIS

The plaintiff alleges that the ALJ's decision is not based upon substantial evidence, and the ALJ erred by (1) failing to properly consider the opinions of treating physicians Drs. Kanos and Van Pelt; (2) failing to perform a function by function assessment; (3) failing to consider whether she was disabled for at least a closed period of time; (4) failing to properly evaluate her subjective complaints; and, (5) failing to comply with Social Security Ruling ("SSR") 00-4p.

### *Treating Physicians*

The plaintiff argues the ALJ did not properly evaluate the opinions of Drs. Kanos and Van Pelt (pl. brief at 17-24). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient

9

is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

Dr. Van Pelt examined the plaintiff in September 2006, and Dr. Kanos examined her in December 2006 and November 2007 (Tr. 241-43; 245-47; 382-83). As discussed above, in June 2009, both provided opinions indicating that the plaintiff would have to rest during a workday; would miss more than three days of work per month; and would experience problems with attention and concentration (Tr. 388-89). Dr. Kanos stated that he based his opinion on the plaintiff's physical exam, history, and radiology (Tr. 388). Dr. Van Pelt stated his opinion was based on the plaintiff's pain distribution, Spurling's sign, and the MRI finding (Tr. 389).

The ALJ founds as follows with regard to these opinions:

10

The opinions expressed are quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. The doctors' own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled[,] and the doctors specifically address this weakness. The doctors' descriptions has been quite vague and general, lacking specificity which might otherwise make it more convincing. Physical examination consistently showed the claimant's gait and station are normal[,] and she has normal strength and tone. She generally has full cervical and shoulder range of motion.

In sum, the above residual functional capacity assessment is supported by the medical evidence of record considered as a whole and the opinions of the reviewing state medical experts.

(Tr. 12-13).

The vocational expert testified at the hearing that if the limitations cited by Drs. Van Pelt and Kanos were accepted there would be no work that the plaintiff could do (Tr. 34). The plaintiff argues that the ALJ must have overlooked the doctors' treatment notes because those reports provide detailed support for their opinions, making them more than conclusory. Specifically, Dr. Van Pelt took a complete history, performed a physical examination, and reviewed the objective findings from x-rays and MRI studies. Dr. Van Pelt's assessment was as follows:

This patient's clinical history and physical exam is consistent with cervical spondylotic radiculopathy. I feel her symptoms are most likely coming form the left side of the disc herniation at C4-C5. There may be some component of her symptoms from the central stenosis at C5-C6. I discussed the natural history of this condition with her in that often these patients will experience diminishing of their symptoms within 6-8 weeks of conservative care, which she is well beyond. She understands that conservative treatments available include rest and pain medication followed by physical therapy as her symptoms allow. Oral and/or epidural steroids are other options to consider. However, I doubt their efficacy in this now chronic situation. I also discussed potential surgical options including a discectomy and fusion if her symptoms fail to improve or she has a progressive neurologic deficit and conservative management has been exhausted.

11

(Tr. 242).

      Dr. Kanos also performed a physical examination, in addition to taking the plaintiff's history and reviewing records and diagnostic test results. Dr. Kanos' impression was as follows:

> 44 year old woman here for a second opinion from a work related injury. On August 25, 2004 she had an on the job injury. She was sewing at work and developed a sharp pain in her neck and going down her left lateral arm to her elbow. She has no right arm pain. Her neck pain is worse than her arm pain. She has had physical therapy, she has not had any injections. She has been out of work since January 21, 2005.
>
> Her MRI shows a C4-C5 5-6 spondylosis with left sided cord distortion, she has minimal right C6-7 stenosis. She has no right sided symptoms.
>
> This is a patient with a severe history that has not worked in 2 years. Her MRI shows spondylosis at C4-5 5-6. She has seen Dr. Van Pelt who offered a 2 level discectomy. I think that is appropriate at this point. Other conservative treatment options would be injection, but I think given the duration of her symptoms surgery should be considered. I agree with Dr. Van Pelt and his plan. The patient asked about the risks and benefits of surgery. Risks of bleeding, infection, food pipe injury, hoarseness, death, stroke, blood vessel injury, paralysis, and weakness were explained to her today.

(Tr. 247).

      The ALJ did not state what weight was given to the opinions of Drs. Van Pelt and Kanos (*see* Tr. 12-13). Further, as argued by the plaintiff, the opinions do not appear to be inconsistent with the record as a whole. The opinions are consistent with one another, and the physicians from Doctors Care Berea often noted the plaintiff's pain and kept her out of work (Tr. 173-82). Also, the treatment notes of Dr. Millon, who treated the plaintiff for carpal tunnel syndrome, do not appear to be inconsistent with the opinions of Drs. Van Pelt and Kanos. The only opinions cited by the ALJ that contradict the opinions of Drs. Van Pelt and Kanos are the opinions of the non-examining State agency doctors.

12

However, the ALJ did not even give those opinions full weight, stating:  "[N]ew medical evidence has been received since these determinations were made which indicate the claimant's condition is slightly more limiting than first thought" (Tr. 12).

Based upon the foregoing, upon remand, the ALJ should be instructed to reconsider the opinions of Drs. Van Pelt and Kanos in accordance with the above.

***Residual Functional Capacity***

The plaintiff next argues that the ALJ erred by failing to perform a function by function assessment of her RFC.  Social Security Ruling 96-8p, 1996 WL 374184, provides:

> The [residual functional capacity ("RFC")] assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.
>
>      ***
>
> At step 5 of the sequential evaluation process, RFC must be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do.  However, in order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level.  Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.

*Id.* at *3.  "In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" *Id.* at *7 (footnote omitted).

As argued by the plaintiff, the ALJ failed to determine in his RFC finding the amount of time the plaintiff could stand, walk, and sit in a normal work day (*see* Tr. 12-13). Furthermore, the ALJ noted the plaintiff's testimony that she could sit for a maximum of two

hours out of an eight hour day and would have problems bending her neck to look down (Tr. 12), but did not adequately explain why that testimony was not accepted. "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, at *7.

Accordingly, upon remand, the ALJ should be instructed to provide a function by function assessment of the plaintiff's RFC in accordance with the foregoing discussion.

### Closed Period of Disability

The plaintiff argues that the ALJ erred in failing to consider whether she was disabled for at least a closed period of time. The record reveals that out of work slips were written on June 13, 2005; July 8, 2005; and August 9, 2005 (Tr. 174, 178, 179). On March 20, 2006, Dr. Millon indicated that Dr. Rubel had the plaintiff "out of work for more proximal problems" (Tr. 214). While out of work slips do not in and of themselves demonstrate disability, upon remand, the ALJ should at least consider whether a closed period of disability has been established.

### Credibility

The plaintiff next argues that the ALJ failed to properly consider her subjective complaints. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

  The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

   (1) the individual's daily activities;

   (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

   (3) factors that precipitate and aggravate the symptoms;

   (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

   (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

   (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

   (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC finding (Tr. 12). The ALJ noted that the plaintiff took no narcotic pain relievers, just ibuprofen and flexeril, and further stated as follows:

> The claimant declined surgery for her neck problems when that was suggested. But, apparently, the claimant has some conservative treatment options that have not been pursued, such as injections suggested by Dr. Kanos. There are no findings of atrophy or other indications of long-term debilitating pain. The claimant's pain may preclude more exertional work, but the above residual functional capacity takes into account her credible allegations regarding limitations due to pain.

(Tr. 12).

The plaintiff argues that she provided a valid reason for not having the surgery - she was afraid and there was no guarantee it would work (Tr. 26-27) - and thus the ALJ erred in considering her failure to have the surgery in his credibility analysis. She contends the ALJ did not comply with SSR 82-59 (pl. reply brief at 7-14). SSR 82-59 discusses the application of 20 C.F.R. § 404.1530, which provides that an otherwise disabled claimant's failure to follow prescribed treatment that could be expected to restore her ability to work will *automatically* result in a finding that she is not disabled. SSR 82-59, 1982 WL 31384, at *1. However, the ALJ did not apply Section 404.1530 or find that the plaintiff's failure to follow prescribed treatment automatically resulted in a finding that she was not disabled. Instead, the ALJ considered the plaintiff's failure to have the surgery recommended by two treating physicians in weighing the veracity of her assertion that she experienced disabling limitations. As discussed above, agency regulations provide that it is proper to consider factors such as the plaintiff's medications, treatment, and "any measures you use or have used to relieve your pain or other symptoms" in assessing a claimant's credibility. 20 C.F.R.

16

§ 404.1529(c)(3). This court sees no error in the ALJ's consideration of this evidence in the assessment of the severity of the plaintiff's impairments.

The ALJ also found that the objective medical evidence did not fully support the plaintiff's claims, noting that there were "no findings of atrophy or other indications of long-term debilitating pain" (Tr. 12). As argued by the Commissioner, a lack of objective medical evidence may be used as one factor in a credibility analysis, so long as there are other valid reasons to question a claimant's credibility. As the Fourth Circuit Court of Appeals stated in *Craig v. Chater*:

> This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

76 F.3d at 595. *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

17

Based upon the foregoing, this court finds that the ALJ properly considered the plaintiff's credibility.

***SSR 00-4p***

Finally, the plaintiff argues that the ALJ erred in failing to comply with SSR 00-4p, which provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the [Dictionary of Occupational Titles ("DOT")]. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *3-4.

In his decision, the ALJ stated, "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" (Tr. 14). However, the ALJ did not question the vocational expert regarding any potential conflicts in the hearing.

Furthermore, in response to the ALJ's second hypothetical, which included the RFC adopted by the ALJ in his decision, the vocational expert identified the jobs of housekeeper, cashier II, and office helper as jobs the plaintiff could do (Tr. 32). However,

the vocational expert did not provide the DOT numbers for these jobs during the hearing. The ALJ specifically asked for the numbers to be provided after the hearing:

> Q. I just need to have those DOT numbers you were looking at.
>
> A. Oh, thank you.
>
> Q. Oh, no problem.
>
> A. I apologize.
>
> Q. It's a [inaudible] requirement.
>
> A. Let me, let me just, I'll, I'll write them down and when you come back in I'll give them - -
>
> Q. Okay.
>
> A. -- to you –
>
> Q. That's fine.
>
> A. - - if that's alright, because I know we're trying to get the other gentleman in, too.
>
> ATTY. Yeah, that's fine.
>
> ALJ. No, that's fine. If we need to do them right now we'll do them, but if you want to wait, that's fine. Any objection to waiting?
>
> ATTY. Any, oh, I have no objection to getting them in - -
>
> ALJ. Alright.
>
> ATTY. - - after the hearing.

(Tr. 32-33).

In his decision, the ALJ relied on the vocational expert's testimony and found that a person with the plaintiff's vocational factors and RFC could perform the representative occupations of housekeeper, cashier II, and office helper, and thus could perform jobs that exist in significant numbers in the national economy (Tr. 13-14).  While the Commissioner is correct that the ALJ is not limited by the regulations to consideration

19

only of DOT job classifications (*see* 20 C.F.R. § 404.1566(d)), here the hearing testimony indicates that the vocational expert was "looking at" specific DOT numbers during his testimony, but they were never entered into the record (*see* Tr. 32-33). Thus, the ALJ relied on the testimony without ascertaining the DOT numbers and without questioning the vocational expert regarding any potential conflict. The Commissioner counters that the error is harmless and identifies DOT entries for two of the three identified jobs, housekeeper and office helper (def. brief at 12). The failure to make the appropriate inquiry may be harmless error in some cases. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). However, here the ALJ has failed to both ascertain the specific DOT numbers and adequately question the vocational expert, and thus the court cannot find harmless error without accepting the Commissioner's *post hoc* rationalization. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Accordingly, this court recommends that, upon remand, the ALJ be instructed to comply with SSR 00-4p at step five of the sequential evaluation process.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/ Kevin F. McDonald
United States Magistrate Judge

November 10, 2011

Greenville, South Carolina

20